**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**UNITED STATE OF AMERICA**

**v.**                                                                                          **CRIMINAL NO.  3:03-cr-30-HTW-LRA**

**KATHLEEN NELSON**

**GOVERNMENT RESPONSE IN OPPOSITION TO DEFENDANT
KATHLEEN NELSON'S MOTION FOR COMPASSIONATE RELEASE**

The United States of America, by and through the Office of the United States Attorney, respectfully requests that the Court deny the Defendant's Motion for Compassionate Release and Memorandum in Support (ECF Doc. No. 374 and 376), which is based on COVID-19 concerns, for the reasons that follow.

**BACKGROUND**

On February 5, 2003, Defendant Kathleen Nelson was indicted in a two-count indictment charging False Endorsements and Theft of Public Funds, in violation of Title 18, United States Code, Sections 510 and 641.  *See* ECF Doc. No. 1.  On May 1, 2003, a Superseding indictment was returned charging the same violations, but the additional violations of Mail Fraud, Bank Fraud, additional charges of False Endorsements, Theft of Government Funds, and Harassment of a Witness, in violation of Title 18, United States Code, Sections, 1341, 1344, 510, 641, and 1512. *See* ECF Doc. No. 21.  On June 4, 2003, a second Superseding indictment was returned adding additional counts of prior violations charged. *See* ECF Doc. No. 22.  On October 7, 2003, a third Superseding indictment was returned adding the charges of Witness Tampering, where death results, and additional defendants, in violation of Title 18, United States Code, Section 1512. *See* ECF Doc. No. 56.  On February 4, 2006, following a two-week trial, the defendant was found

guilty of the counts charged and was sentenced to serve a term of Life imprisonment, followed by 5 years supervised release. *See* ECF Entries (no docket number), dated 2/4/2006 (jury verdict ECF Doc. No. 232) 4/13/2006 (sentencing). The order of judgment was entered on April 18, 2006. *See* ECF Doc. No. 225. The defendant filed a Notice of Appeal, on June 9, 2006. *See* ECF Doc. No. 261. On September 14, 2017, the Fifth Circuit affirmed the jury verdict. *See* ECF Doc. No. 280. The defendant filed a Motion to Vacate pursuant to Title 28, United States Code, Section 2255 on May 11, 2020. *See* ECF Doc. No. 366. The defendant filed her Motion for Compassionate Release on June 29, 2020. *See* ECF Doc. No. 374.

The Defendant is currently serving her sentence at FMC Carswell, located in Ft. Worth, Texas, and received a sentence of Life imprisonment and therefore does not have a release date. The Defendant's Motion seeks compassionate release due to the COVID-19 pandemic.[1]

## LAW AND ARGUMENT

**1.    Nelson's Request for Compassionate Release**

Nelson has not complied with the requirements of the First Step Act by exhausting her administrative remedies. As discussed in detail below, Nelson can petition the court for a reduction of her sentence, ***after***, she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons (BOP) to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. 3582(c)(1)(A).

**2.    Bureau of Prisons Response to COVID-19**

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused

---

[1] To the extent Nelson is requesting the court place her in home confinement based on a home confinement date calculation, BOP has sole discretion to determine Nelson's place of incarceration. *See* 18 U.S.C. § 3621(b); *Cade v. United States*, 2019 WL 669570 (S.D. Miss. Feb. 19, 2019).

2

many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority."  BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.  BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.  That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i.  The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January.  At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities.  Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations.  The current modified operations plan requires that all inmates in

every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though, there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, *etc*.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended, to limit the number of people entering the facility and interacting with inmates. In order to ensure that

familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits may become available in the future but permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 3,545 inmates to home confinement. Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/. Additionally, as of this filing, FMC Carswell notes that it has 45 inmates and 1 staff members with confirmed cases. Id. at https://www.bop.gov/coronavirus/

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. However, BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And, it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## LAW AND ARGUMENT

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—

(A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)  extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582 (c)(1)(A)(i).

Further, 28 U.S.C. § 994(t) provides:  "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[2]

---

[2]  Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

The Sentencing Guidelines policy statement at § 1B1.13 provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)      Medical Condition of the Defendant.—
>
>     (i)      The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>     (ii)      The defendant is—
>
>         (I)      suffering from a serious physical or medical condition,
>
>         (II)      suffering from a serious functional or cognitive impairment, or
>
>         (III)      experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B)      Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the

---

There is no right to counsel with respect to a motion for compassionate release. *United States v. Smith*, 2019 U.S. Dist. LEXIS 96383 (E.D. Ky. June 7, 2019).

        aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

  (C)    Family Circumstances.—

        (i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.

        (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

  (D)    Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

For its part, consistent with application note 1(D), BOP promulgated Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf, amended effective January 17, 2019, to set forth its evaluation criteria.

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin,* 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

Nelson has also asked that this Court order BOP to place her on home confinement. That request should be denied because this Court has no authority to direct BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion. Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002)

(plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). Because Nelson request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny her request.

Defendant has not meet the requirements 18 U.S.C. § 3582 as modified by the First Step Act to qualify for compassionate release for extraordinary and compelling reasons. Based upon her statements in her filings with this Court, defendant's possible basis for her requested relief under Paragraph (A)(ii)(I) noted above, the suffering from a serious physical or medical condition…that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" is without merit. Nelson's motion states that she has lupus, rheumatoid arthritis, moderate asthma, borderline diabetic, hypertension, heart murmur, and kidney issues. *See* ECF Doc. No. 374 at 2. Nelson does not provide any support to show that she is not receiving necessary care. In fact, Nelson states that she is being treated. *See* ECF Doc. No. 374-3. Nelson has not shown any evidence that she would be safer if released. Additionally, she does not show how she is *unable* to provide self-care, as required. The absence of a clear plan to avoid the risk of COVID-19 upon release is highly relevant and this Defendant has not shown that she is more likely to contract COVID-19 in prison than outside the prison.

Neither the policy statement nor the BOP regulation provides any basis for compassionate release based on general COVID-19 concerns. Rather, the grounds for compassionate release the Commission identified are all based on inherently individual circumstances—health, age, and family responsibilities—and, not surprisingly, nothing remotely

10

comparable to the general COVID-19 concerns that thousands of offenders could cite in compassionate-release motions. On this basis, at least one district court has already denied a defendant's compassionate-release motion. *See United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("As defendant does not assert that he is suffering from a medical condition as defined in U.S.S.G. § 1B1.13, a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A)."). A more recent decision echoes the *Eberhart* decision stating: "General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." *United States v. Koons*, No. 16-214-05, 2020 WL 1940570, at *5 (W.D. La. Apr. 21, 2020).

      Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). The defendant has not put forth any evidence that she is not a danger to the community. Nelson was convicted of very serious offenses, conspiracy to kill a government witness, conspiracy to commit mail fraud, bank fraud, conversion of government funds, and attempting to obstruct Grand Jury proceedings. While she has been incarcerated since at least 2006, she has not shown how she is not a danger to the safety of any other person or the community, as required. The safety of the community has been found to refer "not only to the mere danger of physical violence but also to the danger that the defendant might engage in criminal activity to the community's detriment." *United States v. Mackie*, 876 F. Supp. 1489,

11

1491 (E.D. La. 1994).

In the event the court chooses to grant Nelson request for release, the government asks that the release date be 14 days from the court's order to allow BOP to place Nelson in quarantine for 14 days before being released to mitigate the risk and exposure to the general public. The government also requests that if Nelson is released from prison, she serve her remaining time in home confinement with electronic monitoring.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court DENY the Defendant's motion for release based on COVID-19 concerns.

Respectfully submitted on this the 6th day of July, 2020.

                D. MICHAEL HURST, JR.
                United States Attorney

By:    s/*Erin O. Chalk*
        ERIN O. CHALK (MS# 101721)
        Assistant U.S. Attorney
        501 E. Court Street, Suite 4.430
        Jackson, MS 39201
        Ph: 601.965.4480
        Fax: 601.965.4409
        erin.chalk@usdoj.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that on July 6, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system to all ECF participants of record and to the defendant, using the United States Postal Service, postage prepaid, at her last known address of Levon Edmond, Inmate Number 067879-043, at her last known address of FMC Carswell, Federal Medical Center, Post Office Box 27137, Ft. Worth, Texas 76127.

      *s/ Erin O. Chalk*
      ERIN O. CHALK
      Assistant U.S. Attorney