IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**UNITED STATES OF AMERICA**

v.                                                    CRIMINAL NO. 3:03-cr-30-HTW-LRA

**KATHLEEN NELSON**

<u>Reply Supporting
Motion for Compassionate Release
Under 18 U.S.C. § 3582 (c)(1)(A)</u>

**\*\*\*expedited consideration requested\*\*\***

Comes now Defendant Kathleen Nelson and files this Reply Supporting Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A). In support of this Motion, Ms. Nelson presents the following:

### I.     Introduction

The Government argues that Ms. Nelson is not entitled to compassionate release for three reasons: (1) Ms. Nelson has not exhausted her administrative remedies; (2) this Court does not have authority to place Ms. Nelson on home confinement because the Bureau of Prisons is solely responsible for determining an inmate's confinement; and (3) Ms. Nelson has not met the requirements of 18 U.S.C. § 3582 as modified by the First Step Act to qualify for compassionate release for extraordinary and compelling reasons.

Ms. Nelson disagrees with the above contentions. First, Ms. Nelson has exhausted her administrative remedies. Second, this Court's authority to order Ms. Nelson to serve the remainder of her sentence on home confinement is exclusively granted under the First Step Act and the "extraordinary and compelling reasons" language of § 3582(c)(1)(A)(i). Third, Ms. Nelson has shown "extraordinary and compelling reasons" because she is a nearly 62-

year-old woman who suffers from lupus, thyroid cancer, rheumatoid arthritis, moderate asthma, prediabetes, hypertension, heart deficiencies, and severe kidney issues; therefore, she is medically vulnerable to the highly deadly strand of the Coronavirus, Covid-19.[1] Lastly, Ms. Nelson is not a danger to society. The law and argument are as follows.

### I.     The 30-day exhaustion requirement was met.

Ms. Nelson sufficiently exhausted her administrative remedies. Ms. Nelson submitted her request for compassionate release on April 29, 2020. This submission was done pursuant to the resources (or lack thereof) available to her at the prison. Ms. Nelson deposited her request in the mailbox on her unit. Though no fault of Ms. Nelson, she did not have access to a copier, and she was unequipped and unable to secure a copy of her request. After receiving no response from the BOP, Ms. Nelson filed her motion with the Court on June 29, 2020. Therefore, this Court should find that she complied with the requirements of the First Step Act and sufficiently exhausted her administrative remedies.

### II.    This Court has authority to grant home confinement.

The Government argues that this Court does not have authority to order home confinement and that such authority exclusively lies with the BOP. However, this changed with the passage of the First Step Act in 2018. *See* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which a § 3582(c)(1)(A) compassionate release occurs. An inmate no longer has to depend solely upon the BOP Director to determine an extraordinary circumstance and move for the release of an inmate. Now, a court can resentence "upon motion of the defendant," after the inmate exhausts administrative remedies with the BOP, or after 30 days from the receipt of the inmate's request

---

[1] *See* Medical Records attached to Nelson's Reply Supporting Motion for Compassionate Release as Exhibit "A."

for compassionate release with the warden of the defendant's facility, whichever comes earlier. 18 U.S.C. § 3582(c)(1)(A). Thus, under the First Step Act, a court may now consider the defendant's own motion to be resentenced, without waiting for it to be made by the BOP.

Additionally, the relevant part of 18 U.S.C. § 3582 states that "the court. . . may reduce the term of imprisonment (and may impose a term of probation or *supervised release* with or without conditions that does not exceed the unserved portion of the original term of imprisonment)[.]" 18 U.S.C. § 3582(c)(1)(A) (Emphasis added). 18 U.S.C. § 3583(e)(4), which deals with supervised release, states that the Court may "order the defendant to remain at his place of residence during nonworking hours and, if the court so directs, to have compliance monitored by telephone or electronic signaling devices, except that an order under this paragraph may be imposed only as an alternative to incarceration."

The passage of the First Step Act coupled with these statutory provisions give the Court authority to order home confinement. Moreover, in *Sowell v. TDCS*, Civil Action No. H-20-1492, 2020 WL 2113603 at *2 (S.D. Tex. May 4, 2020), the court specifically held that "[t]he 'Compassionate Release' statute effectively allows courts to release federal inmates to home confinement, following statutory exhaustion, for 'extraordinary and compelling reasons.'" (Citing 18 U.S.C. § 3582(c)(1)(A)(i)). Therefore, this Court has authority to grant Ms. Nelson's request for home-confinement.

## III. The Covid-19 pandemic warrants releasing Ms. Nelson to home confinement.

The Covid-19 outbreak presents a compelling and extraordinary circumstance that warrants compassionate release to home confinement in Ms. Nelson's case. As Ms. Nelson's medical records provide, she suffers from lupus, thyroid cancer, rheumatoid arthritis, moderate asthma, prediabetes, hypertension, heart deficiencies, and severe kidney issues. *See* Medical Records

attached to Nelson's Reply Supporting Motion for Compassionate Release as Exhibit "A." The Centers for Disease Control and Prevention ("CDC") has identified that the individuals most at risk of death from Covid-19 include individuals with chronic medical conditions, such as lung disease, heart disease, and diabetes.[2]

A CDC report on U.S. hospitalizations for COVID-19 published on April 8, 2020, found that "89.3% of 1,482 hospitalized patients had one or more underlying conditions. The most common were hypertension (49.7%), followed by obesity, chronic metabolic disease (such as diabetes), chronic lung disease (including asthma) and cardiovascular disease. Patients 50 and older comprised 74% of cases. The report also confirms that African-Americans are much more likely to be hospitalized with COVID-19: 33% were Black, even though the percentage of Blacks in the geographical areas was only 18%."[3] Again, Ms. Nelson fits multiple categories as she has lupus, thyroid cancer, rheumatoid arthritis, moderate asthma, she is borderline diabetic, hypertension, heart deficiencies, severe kidney issues and she is an African American.

As of September 27, 2020, there have been at least 32,730,945 confirmed cases of COVID-19, including 991,224 deaths.[4] The United States is leading with the world's highest number of Covid-19 cases and deaths; according to the CDC, approximately 7,059,087 have been infected with the death total rising to 204,033.[5] These numbers almost certainly underrepresent the true scope of the crisis; test kits in the United States have been inadequate to meet demand.

Since there is no specific treatment for or vaccine to prevent COVID-19, the CDC recommends those in a higher risk category to avoid being exposed to the virus.[6] Further, the

---

[2] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html
[3] https://www.cancerhealth.com/article/who-is-most-susceptible-new-coronavirus
[4] https://covid19.who.int/
[5] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html
[6] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

CDC recommends frequent hand washing, practicing social distancing, wearing a face mask when social distancing is not possible, and cleaning and disinfecting frequently touched surfaces daily.[7] It is impossible for Ms. Nelson to follow the CDC's guidelines while in prison. Jails and prisons are among the most dangerous places to be during an epidemic because they create the ideal environment for transmission of contagious diseases.[8] Incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings," according to public health experts.[9]

Ms. Nelson is stationed at a prison that the novel coronavirus swept through and hit the hardest—Federal Medical Center Carswell ("FMC"). [A]t one point in July [FMC] had the second most cases of the virus of any federal prison."[10] As of September 28, 2020, FMC's positive cases have quickly climbed to 620.[11] Additionally, Ms. Nelson uses her personal experience to shed light to the conditions at the prison, not merely a recitation of the BOP's safety measures that are plastered on its website. Painting an unpleasant picture, Ms. Nelson explains that she is housed in an environment with close quarters, common areas, and limited

---

[7] *Id.*

[8] Matthew J. Akiyama, *et al.*, Flattening the Curve for Incarcerated populations – COVID-19 in Jails and Prisons, NEW ENGLAND J.MED. (Apr. 2, 2020), https://www.nejm.org/doi/full/10.1056/NEJMp2005687 ("Therefore, we believe that we need to prepare now, by 'decarcerating,' or releasing, as many people as possible . . . ."); Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 CLINICAL INFECTIOUS DISEASES 8, 1047–55 (Oct. 15, 2007), *available at* https://doi.org/10.1086/521910.

[9] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), *available at* https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.

[10] https://www.msn.com/en-us/news/crime/fifth-woman-dies-from-covid-19-at-fort-worth-prison-women-say-cases-have-not-gone-down/ar-BB186dIq

[11] https://www.bop.gov/coronavirus/index.jsp

common telephones and computers. There are over 300 women at her unit, but Ms. Nelson does not have access to cleaning and sanitizing products that kill bacteria and germs. There is no soap, no hot or warm water, no hand towels, and no disinfect spray to disinfect items and things that she (and others) frequently use. Under these conditions, Ms. Nelson does not have the benefit of protecting herself with the *only* preventive measures that we currently have as she cannot properly and frequently wash her hands, sanitize her hands and items often, social distance, wear a mask, or make the guards wear a mask. The Government argues that Ms. Nelson "has not shown any evidence that she would be safer if released," but given that if granted home confinement she would not be housed with 300 people and she will be able to utilize not one but *every* preventative method currently available, Ms. Nelson begs to differ.

The Government's response states that "in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the lease threat to the community, BOP is exercising greater authority to designate inmates for home confinement." ECF Doc. No. 380. Ms. Nelson has proven that she is most vulnerable to the disease because of her medical condition. Ms. Nelson she is a nearly 62-year-old woman who suffers from lupus, thyroid cancer, rheumatoid arthritis, moderate asthma, borderline diabetes, hypertension, heart deficiencies, and severe kidney issues, all of which are serious in and of themselves. *See* Medical Records attached to Nelson's Reply Supporting Motion for Compassionate Release as Exhibit "A." As data shows, those serious illnesses make her highly susceptible and vulnerable to Covid-19. In fact, Ms. Nelson's per-existing conditions present a perfect storm that will likely result in her death. This alone represents a compelling reason to

grant compassionate release, but as the next section will show, Ms. Nelson is not a danger to society.[12]

### IV.     Ms. Nelson is not a danger to society.

Ms. Nelson's BOP incarceration began in 2006, over 14 years ago. ECF Doc. No. 374. Since then, Ms. Nelson has had no disciplinary infractions. *Id.* In fact, Ms. Nelson is housed in a low security institution. *Id.* Ms. Nelson has taken many classes and she has even learned a second language—Spanish. *Id.* Ms. Nelson is 60 years old and she has served nearly 50 percent of her full prison term. *Id.* Ms. Nelson's participation and completion of many classes coupled with her age make her less likely to be a threat to society. *Id.*

The United States Sentencing Commission began studying recidivism after the enactment of the Sentencing Reform Act of 1984 ("SRA").  One report issued by the commission focused on the relationship between age at release and recidivism.  *The Effects of Aging on Recidivism Among Federal Offenders by The United States Sentencing Commission, December 2017.*

One of the key findings of the Commission's study of federal offenders' recidivism by age at release was that:

"Older offenders were substantially less likely than younger offenders to recidivate following release. Over an eight-year follow-up period, 13.4 percent of offenders age 65 or older at the time of release were rearrested compared to 67.6 percent of offenders younger than age 21

---

[12] The Government irrelevantly argues that compassionate releases cannot be based on general COVID-19 concerns, citing *United States v. Eberhart*, 2020 WL 1450745, at 2 (N.D. Cal. Mar. 25, 2020) and *United States v. Koons*, No. 16-214-05, 2020 WL 1940570, at 5 (W.D. La. Apr. 21, 2020) for support. Here, Ms. Nelson is not arguing general COVID-19 concerns. Rather, Ms. Nelson argues legitimate grounds based on her health and age as outlined and required under the 18 U.S.C. § 3582.

at the time of release. The pattern was consistent across age groupings, and recidivism measured by rearrest, reconviction, and reincarceration declined as age increased."

> *Id. at 3*.

In conducting its research, the Commission used a follow-up period of eight years for determining recidivism rates. It considered all recidivism events (including felonies, misdemeanors, and "technical" violations of the conditions of supervision), except minor traffic offenses, which occurred over that eight-year period. Although the report includes summary findings using all three measures (rearrest, reconviction, and reincarceration), it primarily relied on rearrest data in compiling detailed information about the recidivism of federal offenders. *Id.* at 6.

> As a result of its research and analysis, the Commission concluded, in part, the following:
>
> 1) older offenders are substantially less likely to recidivate following release compared to younger cohorts. Among offenders released younger than age 21, 67.6 percent were rearrested compared to 13.4 percent of those released age 65 or older;
> 2) consistently across age groups, as age increases recidivism by any measure declined;
> 3) Older offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses on average.
>
> *Id.* at 30.

The research is clear. The older an offender is at the time of release the less likely he/she is to recidivate.

Another factor supporting that Ms. Nelson is not a danger to society is her re-entry plan. If Ms. Nelson is released to home confinement, she will either reside in Desoto, Texas with her sister or return to Mississippi to live with her daughter. ECF Doc. No. 374. Ms. Nelson will be in great care with much needed support as both of them own their home and neither has a criminal history. *Id.* As shown, Ms. Nelson is not a danger to society.

### IV.   Conclusion

For the reasons stated above and in Ms. Nelson's Motion for Compassionate Release, this Court should grant the subject Motion.

WHEREFORE, Defendant Kathleen Nelson asks this Court to grant her Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A).

Respectfully submitted October 2, 2020.

|  |  |
|---|---|
| BY: | **Kathleen Nelson,** Defendant |
|  | _____ |
|  | AAFRAM Y. SELLERS, MSB #100261 |
|  | **SELLERS & ASSOCIATES** |
|  | 395 Edgewood Terrace Drive |
|  | Jackson, Mississippi 39206 |
|  | Telephone: (601) 352-0102 |
|  | Facsimile: (601) 352-0106 |
|  | Email: aafram@sellerslaw.net |
|  | *Attorney for Defendant* |

### CERTIFICATE OF SERVICE

I, Aafram Sellers, certify that on October 3, 2020, this Reply was filed with the Clerk of the United States District Court for the Southern District of Mississippi, using the electronic case filing system, which in turn sent an electronic copy of this Reply to all attorneys of record in this case.

s/ *Aafram Y. Sellers*
**Aafram Y. Sellers** (MB # 100261)

Attorney for Defendant